Case No. 16-1298 Natural Resources Defense Council et al. Petitioners v. U.S. Nuclear Regulatory Commission et al. Ms. Anderson for Petitioners, Mr. Michael Schell for the Respondents, Mr. Pugsley for the Intervenor. Thank you, Mr. Schell. Good morning. Good morning. May it please the Court, Shannon Anderson on behalf of Petitioners. I have come to you today from Wyoming to talk about how the NRC violated NEPA when it issued a license to mine and process uranium. First, NRC violated NEPA's twin aims of informed decision-making and public disclosure because the license, which was the major federal action subject to NEPA, was not supported by a complete EIS that addressed all significant environmental impacts. This Court has repeatedly held that under NEPA, an agency must consider every significant aspect of the environmental impact of a proposed action prior to its decision. The Hearing Board, after affirming that there was a serious omission regarding groundwater impacts analysis in the EIS, refused to reverse the license and remand to NRC staff to conduct the hard-look analysis necessary to support its decision. I'm sorry. Serious is your characterization. That's correct. It was a serious omission. And the Board found... Your Honor, the Board found that the analysis was necessary to support the agency's decision. It further analyzed the significance of the information and created some rationalizations for that, but at the forefront, it found that the information was necessary to the decision, and therefore the Board had to supplement the decision in order to justify it, which is illegal under NEPA because the decision had already been made. It was like the Board went back to a train station, but the train had already left, and you can't tack on another car at that time. Well, the train had left provisionally, right? So, I mean, if I understand your argument, it completely bars a process in which there's a provisional decision with review of it afterwards, which can take account of new information. Your Honor, the decision was not provisional. The license that was issued in April of 2014, a full five months before the hearing, was a final agency action. It gave a right and a remedy to the company to start processing and mining uranium before the hearing was made. But it's, in effect, provisional because if the hearing board concludes that that decision was improper and can't be rectified before the hearing board, then that will no longer be a valid license. Sure, and, Your Honor, that's the same as this court right here today. You can remand it back to the agency, and that license would no longer be in effect, but that doesn't mean it wasn't in effect prior to your decision. And so that's the issue here, is that the license was in effect prior to the hearing. All of the cases relied on by the government deal with a situation where the decision wasn't made at the time of the hearing. That's not what we have here. We have a license that was issued prior to the hearing. It wasn't labeled draft. It wasn't provisional. It was a final decision that was made. And so when you say it wasn't provisional, you mean what? It had force and effect. And it was the major federal action subject to me. It isn't obvious to me anyway that decisions which have force and effect are ipso facto not provisional. At least in the sense of being subject to revision and perhaps even revocation, right? Sure, and it was subject to the administrative process. You or the staff brought some further information to bear, and that was then considered, that information. That's correct, Your Honor. But at that time, NEPA had already been completed. I understand that. But just in terms of functional activity here, when new information became available, it was fully, inadequately in your view, but fully, as far as the agency is concerned, considered. Yeah, and to be clear. And the illicit license was amended in some respects. Yeah, and to be clear, Your Honor, it was never new information. What it was, in fact, was information that should have been considered at the outset in the NEPA process. It was the very basis of our contention under NEPA that this was an important part of the environmental analysis of the agency. I understand your legal argument, and I obviously will decide it on that basis, but I want to understand the practical harm that you see arising from the way the agency proceeded here. Sure, Your Honor. So this goes to the very heart of the agency's decision. This is a mine that mines uranium in groundwater. So the level of uranium that is present after that mining operation is the very environmental harm that the agency has a duty to minimize and prevent. And by ignoring the probable consequence of the level of uranium in groundwater after mining, the agency ignored what it is it's supposed to prevent and minimize environmental harm. What is the harm here? It looks to me like there's no harm, no foul. There was a procedural peculiarity. Let's call it even a deviation from appropriate procedure, although that's not clear. But ultimately everything was considered, not to your liking, but considered. So focusing on your procedural objection, I'm not sure why there's anything left to be done. Yeah, and Your Honor, part of this is that we don't want to... What would you have us do? What would you have the agency do? Right. So we can't prejudge a NEPA process that would happen on remand. Why? Is this something they haven't considered? Well, they haven't considered... So there's two parts here. There's the information that the agency provided the board, and then there's information that the petitioners also provided the board, which showed that the agency seriously miscalculated the level of environmental harm to groundwater. And we believe if the process was remanded back to the agency, all of this would be better considered through the agency's decision. But at the very least, it would be disclosed to the public, and there would be that level of public disclosure. Is there something that has not been disclosed to the board? It hasn't through NEPA, in the proper way under NEPA. What has not been disclosed? The level of groundwater contamination from uranium that is a probable consequence of the agency's actions. Isn't that simply a question on which there are a range of predictions? And I take it your prediction is more dire than the agency's prediction. And there's a certain amount of data in terms of historical record on that. What remains to be added? Your Honor, what remains to be added is the decision that flows from that information. So NEPA isn't just about information being out there. The meaning that comes from NEPA is that that information was considered as part of the agency's decision. But they didn't consider it because they modified the license. I mean, it wasn't necessary to demonstrate that they considered it, but there's strong evidence from the fact that they modified the license that they considered it. Right, and the license modification after the hearing had nothing to do with this issue. It was procedural modification. It was related to another contention that we had brought. It wasn't related to this contention. The record of decision that was modified just incorporated that there was a hearing and there was something that resulted from that hearing. It didn't actually analyze the evidence or anything that was brought forth in that hearing process. And importantly, the NEPA document, the EIS itself, was never modified after the hearing. It was never supplemented or augmented. That sounds like a somewhat abstract value. There are all these cases, and I think you cite several of them, that say we can't have post hoc reasoning. But whenever the court remands, that's exactly what you have, post hoc reasoning. And what the court was really aiming at was representations by agency counsel as opposed to a decision by the agency. But here you have a decision by the agency. Nobody's relying on representations of agency counsel. Right. So what happened, though, is at the time the agency made its decision to issue the license, this information was not before the agency. It wasn't considered by the agency, the NRC staff, as part of their major federal action, which was to issue the license. It was post hoc provided at the hearing to the board. But I'm trying to convince you that that ringing phrase does not mean what it appears to mean. And if it did, all these remands that courts incessantly engage in would refute it. Right. Well, there's a difference between, I would say, you ordering the agency to look at it again versus them saying they needed to and they just didn't. Right. So here, again, we have... I'm tired now. You really lost me. We tell them to say, we need this, and then they'll look at it in a different way? Well, during... In their post hoc review? It would be a post hoc review, but that's the very purpose of your review here today, is to make sure the agency followed the law. As Judge Williams says, the post hoc is usually agency counsel coming up with reasons for the agency decision. That's what we're usually referring to here. Right. And it seems to me you want a do-over because maybe somehow you can get a different result before the staff, right, that they wouldn't issue the license this time. But, I mean, they've already... They issued it. The board fixed the defect, colloquially speaking. Yeah, I mean, we want the NEPA process to have meaning. And what's happened is the NRC has... You don't really just want it to have meaning. You want it to have a different result, right? Well, NEPA doesn't mandate results. I mean, that's not what we're asking for. What we're asking for is the agency to take that charge under NEPA seriously, to do what every other administrative agency does, which is to make sure that the environmental information that's necessary for them to consider as part of their decision is considered as part of their decision. And here, they provided it after the fact at the hearing. The board said it was necessary. The staff provided testimony because it was necessary. But it was all after the fact. It wasn't as part of that decision. And so what we'd like you to do is to remand it back to the agency to show that they have to look at this as part of their decision. They can't look at it after the fact. We gave several reasons for thinking that was a poor idea in the Friends of the River case. Remanding it to the agency, which had already considered all of the things put before them, to take a look at it again would be a useless exercise. We said it would breed cynicism about the process. It would consume resources unnecessarily. How is this any different, this case? Well, Your Honor, I think it's important to differentiate the two questions before you. One is whether there is a violation of NEPA. And then the second is what is the remedy that stems from that. And the first issue, we think there is a very clear violation of NEPA. Again, the information wasn't part of the agency. Of course, if there's no remedy, then we really don't have to deal with the first question. I would disagree, Your Honor. I think it's very important to separate out the questions. And in order to give to NEPA any kind of meaning under the underseas process, you have to make the agency follow it. And here, they just didn't. And they provide all these rationales and all these cases that don't have any precedent to their decision. Do you have a right to a hearing under NEPA? So the hearing process wasn't the NEPA document. There is no hearing process for NEPA, is there? No, not generally. The agency just does its analysis, makes its final decision, and is subject to review. That's true. And under the underseas procedure. So here, the agency did its analysis, made its decision, and is subject to review. And you raise some substantive objections to their conclusions. Right. So there's still a lacuna here as to why the procedure matters at this point. It matters, Your Honor, because first of all, the project isn't yet completed. So it's a large project. There's about 25 well fills that are anticipated, about 2,000 wells. That's why the EIS matters, and getting it right matters. But I don't know why that means you need this procedure. Another procedure when there's been one. Yeah. And, Your Honor, we can't predict the NEPA process that would occur on remand. I mean, we can't assume the agency would do one thing or the other again. I mean, what we want is we want the agency to consider this information, and we can't prejudge what will happen when they consider it. Can you be more specific? What is the information they have not considered but should be ordered to consider? So the information relates to the level of groundwater contamination from uranium that is likely to occur after this process is complete. And what has happened at every other single uranium mine in Wyoming, my state, and throughout the West is that no company has restored groundwater to pre-mining conditions. There's always been a level of groundwater contamination that's been higher than what's called baseline. So the staff's testimony showed that in some cases that's 71 times the level of baseline. So there's a level of groundwater contamination from uranium that's there after mining. So the information that was not considered is information about other mines and the experience with that? That's correct. Based on the predictive outcome that would happen at this mine. So it's a probable consequence of mining. This is exempt aquifers or neighboring aquifers? No. So this aquifer itself and the level of groundwater in this aquifer, but also once the mining process stops, there's something called a Kona depression which kind of keeps the contamination contained during mining, but once mining stops, that goes away. Right. And contamination can go beyond the mining area as well. Right. Predictions were made as to how bad both of these effects would be, right? And for the exempt aquifer, it seems to be, as Judge Ginsburg said, no harm, no foul because it's all hopeless anyway, right? Your Honor, that's not exactly correct because the agency still has regulations that deal with groundwater restoration even for an exempt aquifer, so the company still has a duty to restore that aquifer. And your contention is that because some companies have been bad guys and not restored reasonably, not only will this company fit into that pattern, but that's what the agency must predict and act on such a prediction. That's correct, Your Honor, and the board agreed with petitioners throughout the entire three-year hearing process on that point that every single other company has led to groundwater contamination. And so the NRC's goals of groundwater restoration to baseline standards are meaningless because they all go through this other path that allows them to leave residual contamination in the aquifer. This is the ACL path. That's correct, yes. Okay, so they confronted that, right? They didn't confront what a probable ACL would be, so this is the alternative concentration limit that would be allowed by the agency. And what the board found and what, based on petitioners' arguments, was that the agency had a duty to consider the probable consequences of its decision, which were, in fact, that there would be this level of groundwater contamination based on the historic practice and history of other mining operations. That it was probable, it was reasonably foreseeable that there would be groundwater contamination. We'll give you a few minutes on rebuttal. Okay, thank you so much. Good morning, and may it please the Court. I'm Eric Michael, here on behalf of the federal respondents. As we have laid out in our brief in this case, we believe that the Court can view the issues of this case through a relatively straightforward NEPA lens and resolve these issues under familiar NEPA standards of review. When the Court is taking its hard look at what the agency has done through this licensing proceeding, we believe the Court should be considering the totality of the agency's actions here. Not only whether or not the staff took a hard look in the EIS, but whether these post-EIS processes, through which the agency allows petitioners such as the counsels to challenge the environmental analysis that the agency has already performed, whether or not by the time this all culminates in a final order from the Commission, in which it has considered all the issues, whether the agency has taken a hard look. I think the way to look at it is the NRC performs its NEPA analysis first. Then in this proceeding, the agency held a hearing then afterwards. And through this Section 189 hearing process, the agency essentially takes the first look internally through an independent review through the licensing board and on review of the Commission. Their complaint is that the license is issued in the midst of that process, however, and therefore when the license is issued, if you focus on that moment in time, they would say the hard look has not occurred, at least not properly occurred. Sure. And to be clear, Your Honor, yes, the license is, in this case, was issued before the hearing. That is the major federal action which necessitates the preparation of an EIS. And so the NRC staff complies with all the procedural requisites of NEPA before that moment in time. When the hearing then occurs, and if and when new information or newly introduced information is brought to the attention of the board in that hearing, we believe the proper standard to determine whether or not the board or, on appeal, the Commission should have, in fact, remanded or took some action upon the license, the standard there, we believe, is an arbitrary and capricious one. I think it is standard. Our review of the board or of the Commission? The review of both. Whose review? Whose review? In this case, both, Your Honor, because both the board and the Commission, at different points in this proceeding, took a look at the new information that was offered and in both of the cases elected that we agree that this information is not material enough to change the impacts analyses that the staff has already performed. And so on two levels of review, in both instances, both the board and the Commission, made that determination that this information is not material enough, in our judgment, to require revisitation of the impacts analyses the staff has already performed. The staff in the EIS said that impacts would be small. We've looked at the staff's analysis. We've considered the new information that has been brought forth to the agency's attention through this additional Section 189 hearing process, and we do not, in our judgment, believe that the information is material enough to require a revisitation of the analysis that's already been done. The granting of the license, you mean. I guess maybe I'm missing something, but it isn't part of the real-world concern that you do a half-baked EIS, grant the license, and then it's fixed in internal agency review, but the idea would be that the license might not have been granted had the proper EIS been done in the first place by the staff. I understand that may be a real-world concern, and that is how the counsels have characterized it in their brief, that this is a leap-first-before-leap-first-look-later approach. But a couple of things that I would say in that regard, first and foremost is the availability in the agency's procedural regulations to obtain a stay of the licensing decision. A petitioner who believes that they will be harmed irreparably in the interim between license issuance and the conclusion of the agency's licensing process, the culmination of the process being a commission order. I don't think the claim here is interim harm, except in the sense that the train will be perceived to have left the station and there will be no remedy no matter how drastic the environmental adverse findings are. Right. And that's just one consideration of why I think that the hearing process is reasonable and enables the agency to overall take a hard look at the environmental effects of its actions. The other is— You were just saying that a party could seek a stay if there's a problem, right? Yes. But that's not relevant to this case, is it? Well, it's not. You're just faulting them for not seeking a stay. Well, again— Because the harm to which they're complaining is not going to materialize in the first months of this activity. I just rose to that point, Your Honor, that conceptually speaking, if there is concern that issuing a license and then holding a hearing after that, if there is concern that the license is in effect and that there could be irreparable harms that are done during the pendency of that process, that that is one available remedy for someone in the NRC's hearing process who believes that to be the case. And it was not sought in this case. I just wanted to raise that to address that real-world-type practical concern. The other—what I would specifically direct the Court's attention to on this point, pages 142 and 143 of the Joint Appendix, these are the two pages of the Commission's decision in which it is talking about how this augmentation process works in agency practice, where the Commission not only states that under agency's adjudicatory practice, from the time the license is issued, all parties to that proceeding are on notice that it is, in fact, it is effective, but it is, as you stated, Judge Williams, it's provisional in the sense that everyone is on notice that depending how the adjudicatory process plays out, it can be modified, it can be revoked, it can be suspended, depending on the way that the contentions that the Board is considering that have been brought to the attention of the Board. But while you have it, the activity can begin, correct, the project? When the license is issued, the licensee can engage in the activities authorized by that license. It is effective. Do they need anything later to begin mining operations? It's not akin to, for example, the power reactor licensing scheme where there's different— First construction, then later in operation. Right, but there are, for example, built into the license, there are inspection activities that have to occur before actual mining begins. The licensee has to, under the license, submit various data on the well fields it constructs after it receives its license and submit that to the staff for verification. So suppose that went along. There was nothing happened here as it did. NRDC was not coming in when they did. The license is issued, and some months later in this inspection process, something adverse, a potential adverse consequence for the environment is discovered. What does the agency do about that? Well, since they are a licensee, if they're not in compliance with their license, then— They're in compliance, but something unanticipated comes to light. Well, if something— In terms of the environmental analysis, again, and one of the reasons why I say I think this should be viewed under an arbitrary and capricious standard, this decision, whether or not to reconsider or conduct more studies, is I think this is akin to decisions of whether or not to supplement an EIS after the action has been taken. As this court said in the Blue Ridge Environmental Defense League case, citing the Supreme Court's precedent in Marsh, when federal actions are ongoing, there is always the potential for new information to arise. And the agency does have a duty to continually be looking at the— taking a hard look at the environmental aspects of its federal actions. So if that came to light during operations, would it result in the agency amending this EIS or just amending this license? If there were discovery of environmental harms— Or potential harms, yeah. Or potential harms. That they could anticipate. The agency has many tools in its belt in that situation. It can issue orders to change licenses or to amend licenses if need be. There's a process in the agency's process for that. To the extent that new information did arise at the site and the hearing is still ongoing, petitioners who are admitted to that hearing can submit new contentions, as long as they do so in a timely fashion, if it is materially new information that wasn't available at the time the hearing started. And to the extent that those issues arise during the hearing process, they can be entered into the hearing process and litigated if they are brought in a timely fashion. And at the end of the day that can result in an amendment to the license. Yes. Because does it result or can it result in an amendment to the EIS? It can, Your Honor. That's always an option. Has that happened ever? The agency has. I don't believe that it's necessarily reflected in the record of this case, but there are instances where in the hearing process, in the resolution of that process, if the staff's environmental analysis has been deemed to be either not considered all the aspects or if something new has arisen, again, what the commission said in this decision is not only is the process intended to work that way, the commission said in its decision, it is fully our expectation that in an appropriate case the board can and should either suspend the license or remand back to the NRC staff if the new information in the hearing process reveals that something was not considered. But in this case, in exercising its technical judgment and expertise, the board in the first instance said we don't think this information materially affects any conclusions in the EIS. And the commission not only upheld that as reasonable, the board's decision is reasonable, but to get to, if I may, and I know I've overrun my time, but just to finish my point, the question of, okay, so what is the remedy? What is left to be done here? The commission in its decision specifically stated that we not only believe the board's actions were reasonable, but we've reviewed this record, and even considering the new information that was induced during the hearing process, we believe that the record supports the issuance of the license to STRATA. So the commission, the highest level decision makers of the agency, have reviewed the record in this proceeding, including the information that was additionally produced at the hearing, and has made the decision that it supports the issuance of the license. And so then to say that the commission, rather than taking that action on its own accord, must instead remand back to the NRC staff to decide whether or not the new information supports the issuance of the license, that is a decision that the commission can make in its discretion if it chooses to do so. In another case where there were significant defects or significant omissions from the environmental impact statement that were revealed, the commission does have the option to send back to the NRC staff. Can I just try to pin it down? If I understand what you're saying, when new environmental information comes in, the agency has the authority to respond to that in a range of ways, and even if the new information calls for changing the prior action, here the issuance of the license, and even though it's an environmental issue, the agency can do that without restarting the EIS process per se. It has to consider what would be considered in such a process and act reasonably on that information. Is that right? I think that's right, Your Honor, and maybe if I could just talk quickly about the borehole issue in this case, I think it exemplifies exactly how this works out. In the borehole case, the staff, through a number of license conditions, came to the conclusion that although there are boreholes within the vicinity of this project, we believe the impacts associated with those boreholes will be small, given the number of license conditions that have been included to either address or detect excursions from boreholes. And at the hearing, what the board said was we agree fundamentally with what the staff said, but at the hearing, more information was revealed that there is an additional class of boreholes outside of the license condition in the license, about 100 outside the wellfield perimeter, that although low probability, if excursions reach those boreholes, then perhaps the impacts would be different than what the staff said. And so what the board did was affirmatively amend the license and said in this hearing process, we were provided with information which indicates that the license perhaps should be more environmentally mitigative than what the staff had drafted and compelled the NRC staff to, in fact, So I think that that is exemplifying of the broader efficacy of the NRC staff's hearing process, where if new information comes to light, the NRC staff does have the ability to amend the license, to address those conditions, or in extreme cases, remand back to staff, suspend the license while they're in dependency of that remand, if it decides that's the appropriate course of action. Both the board and the commission decided in this case that based on the materiality of the information, that was unnecessary. Is that all? Any further questions? Thank you very much. Thank you. Good morning. Good morning, Your Honors. May it please the Court, my name is Christopher Pugsley, and along with my co-counsel, Anthony Thompson, we are here on behalf of the licensee, Strata Energy Incorporated. First, Your Honors, we'd like to note for the record that we fully support each of the arguments offered by the Nuclear Regulatory Commission in its brief, and believe as the expert technical agency, the determinations of the NRC commission in this case fall squarely within the realm of Chevron deference. First, from the perspective of the licensee, Your Honors, we believe that the critical component of this argument, given the discussion about potential harm that we've already had, is found in the commission's recently ordered 2009 study of past ISR operations, which had occurred at that time over a period of around 40 years. The conclusion of that, the main focus of it, Your Honors, was, were there and had there ever been adverse impacts to what we refer to as adjacent, non-exempt aquifers as a result of ISR operations? The conclusion of the commission in 2009, which still stands today, is that there have not been any impacts from ISR activities to those adjacent aquifers. Flowing from the conclusion of the study are the two critical components upon which the regulatory program NRC employs rests on. First, as a matter of law, under the Uranium Mill Tailings Radiation Control Act of 1978, as it amends the Atomic Energy Act of 1954, the commission is required to implement generally applicable standards promulgated by EPA, most importantly in this case, EPA's Resource Conservation and Recovery Act regulations under 40 CFR Part 264. These are the groundwater quality and restoration standards that NRC has determined in 2007 to apply as a matter of law to ISR wellfields. They consist of the following standards. The first, which has often been referred to as baseline, which is incorrect. Baseline is not part of the Criterion 5B5 standard under NRC's regulations. It is called commission-approved background. Commission-approved background is established after the construction of a wellfield. You have to restore to either commission-approved background or what's called a maximum concentration limit, whichever is higher, or what has been called an alternate concentration limit. These are taken directly from EPA standards and implemented under the Mill Tailings Act by NRC. Following from this, Your Honors, is how NRC regulates ISR operations, which is found in 10 CFR Part 40 Appendix A regulations for 11E2 byproduct material under the Atomic Energy Act. Coming from this, because originally 10 CFR Part 40 was developed for conventional milling operations, NRC developed what's called a standard review plan. It's called NREG 1569, cited in our brief. Under the next terror case, as cited in our brief on page 11, the commission has determined that while a standard review plan, or a guidance document, if you will, does not have the force and effect of law, it is entitled to substantial weight. And the commission has determined under its 10 CFR Part 1 regulations that NRC staff is empowered to interpret the commission's regulations for just this type of activity. Coming from this standard review plan is how a license is developed and the conditions of multiple layers of regulation are developed. The key component to an ISR wellfield, Your Honors, is what we refer to as wellfield balance. You've heard the term cone of depression. That is basically where you take what is called a production bleed out of a wellfield that brings water into the wellfield and prevents migration of it out so that nothing from the wellfield can go to an adjacent non-exempt aquifer. And as I've said that term multiple times in this argument, let me emphasize, under EPA's Safe Drinking Water Act, if you cannot demonstrate that an aquifer where you seek to recover uranium via this process cannot now nor ever in the future serve as a source of public drinking water, there can be no mining there. It is not allowed under EPA regulations. So when the question was asked earlier about are there other requirements that an ISR operator must satisfy or other permits that must be obtained prior to operation other than an NRC license, there are. There are many. You have to get Environmental Protection Agency aquifer exemptions, which is subject to potentially state application to the agency for approval to EPA, as well as what's called an underground injection control permit that deals with, excuse me, the wells in the wellfield that are called injection and production wells as well as your monitor wells, et cetera. Lastly, Your Honors, I've noticed I've significantly exceeded my time. If I may just say one more thing, that as part of this wellfield balance, NRC installs multiple license conditions, including what are called mechanical integrity tests, which are part of the, in response to the question earlier, preoperational inspection, that you have to perform these tests to demonstrate there will be no leaks from any of the wells in the wellfield. You have to have monitor well networks that determine whether an excursion has occurred, and it's important for the court to note that the term excursion is frequently mischaracterized. An excursion is not the migration of alleged contamination to an adjacent non-exempt aquifer. Monitor wells are inside that. They are designed as an early warning system where NRC requires that an ISR operator, on a site-specific basis, determines what constituents, albeit non-hazardous, things like calcium, conductivity, things of that nature, that are demonstrated to be the most mobile based on the science. And once those are determined to be the indicator parameters, if a higher concentration of those are detected at a monitor well, NRC requires that the excursion be reported, that the ISR operator cease recovery activities in the wellfield and bring the excursion back before it is even allowed to continue with uranium recovery. Okay. Thank you very much. Thank you, Your Honor. We'll give you a couple minutes for rebuttal. Thank you. First, I'd like to go back to the NEPA violation that we've been focused on here today. You heard the NRC's counsel use the word extreme in reference to only if there was an extreme issue would it ever be remanded back to the agency from the board. I think that is very telling because what that shows is that it's the agency's view that the board can fix their NEPA, that their EIS prior to the board's decision effectively has no meaning because it can just be fixed by the administrative appeals process. Is it your contention that the only response to new information, environmental information, after an EIS has been completed and action taken is to, A, vacate the action and go back for a renewed EIS? So, Your Honor, again, I think it's important to differentiate the two questions of the violation versus the remedy. But on the violation itself, it's also important to realize, again, this was not new information. This was information that petitioners, for a three-year hearing process, told the petitioner and the remedy. Sure. Judge Williams had a specific question, I think. Yeah. Well, I think underneath that, so the presumptive remedy is vacature and remand. That's the history of NEPA and, you know, the long history under our court system. That is the presumptive remand. And the importance of that is because it remanded. And does this remand require starting at square one for the EIS process? I mean, everything is to be reexamined. As a practical matter, it certainly sounds as if some new environmental impact is found. It makes sense for the acting agency to respond to that, its response being subject to review for being arbitrary and capricious, but to respond to it and move on. I think that would be appropriate in a couple of different ways. One, if the agency, prior to the hearing, hadn't already issued the license. So the case is that the- Well, my hypothesis is that the license is issued and action has started and information comes in or is highlighted, whatever, causing some reconsideration. Right. So there's a process under NEPA, which you're aware of, that it allows for a supplemental EIS if new information is available. That's not what we have here. We have the same EIS. It was never supplemented. It was never augmented. There's no phrase that actually changed the EIS that existed prior to the hearing. So it would be different, I think, Your Honor, if the agency, the board,  And how is that materially different from taking such steps with regard to the license as respond to the information reasonably? So, again, it goes back to when the license was issued, the agency didn't have this information in front of them. Yeah, but when the license was modified, it did, in my hypothesis and the facts. Right, but it never went back to the NEPA document. And so there's this fundamental disconnect between the way the agency has been doing NEPA and the way every other administrative agency in this country does NEPA, and that's to make the NEPA meaningful, it has to be part of the agency's decision to issue the license in the first instance. Without the word EIS, it is part of the agency's decision-making in the sense that the new environmental information is considered and reasonable responses made. Of course, if they're not reasonable, that's reversible. Yeah, and I think that the difference is that the major federal action subject to NEPA was to issue the license in the first instance. It wasn't to look at it after the board, to think about whether to change it, to modify it, to add a new license condition. It was whether to issue or deny the license. And that's the practical harm that you are focusing on is that the license is issued, although I'm not sure why, if the license would be issued after the next stage in the process, what the practical harm really is. Yeah, and that issue is not before us. So we, you know, we may... My point is that in saying, I think, that this is different from what every other agency does, is that there's something unusual or odd about this, and presumably something that's creating a practical problem. The practical problem, I imagine, is that when the license is issued, there's kind of this pressure not to revoke the license. Yeah, there's agency momentum, definitely. And effectively what's happened is, you know, the board is an appeals board, and then the commission is even an appellate level beyond that. And so we... But to Judge Williams' point, if the license would be issued anyway, if they conclude that the license would have been issued anyway, and we've now considered the supplemental, I don't want to use that in a technical sense, the additional information, why is that a problem, I guess? It's a problem because of the lack of public involvement in that agency's decision. So petitioners were the only ones in the room at that stage. There wasn't a NEPA comment process or any other kind of opportunity for the public to be involved. And then it also, again, goes back to what is the agency decision subject to NEPA, and when was that decision made. Go ahead. Counsel, you responded in your reply brief, you replied to the agency's invocation of our Friends of the River president, and this is what you said. In that case, the court considered whether the agency had adequately considered issues before it decided to authorize the project to proceed. But it turns out, as you report later on, the court found that in making its initial decision, the agency had failed to adequately consider a certain alternative and concluded the agency had cured that error by fully and fairly considering that alternative during the rehearing process. So there, there's a rehearing process. The decision was made. It's out there. Petitioners sought rehearing, Friends of the River sought rehearing, and that's where the additional environmental information was considered by the agency, after the original decision had issued. How is that any different than the present situation? So, Your Honor, in Friends of the River and Swinomish Tribal Community and all of these other cases, the environmental impacts information considered at the hearing was prior to the agency's decision. So that's the analogy. Prior to its rehearing decision, but it was after its initial decision. And I think the court found that it was in the rehearing. And that was related specifically to the alternative. It wasn't related to the environmental impacts information. It was a NEPA case. Yeah, that's part of a NEPA analysis. Yeah. Consideration of alternatives. Okay. Okay, thank you. Okay, thank you very much to both sides, all sides, and the cases submitted.
judges: Kavanaugh, Williams, Ginsburg